IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EPIQ CLASS ACTION AND CLAIMS
SOLUTIONS, INC. (formerly Poorman-
Douglas Corporation), a Rhode Island
corporation,

           Plaintiff,

  v.

JAMES R. PRUTSMAN, an individual;
and RUST CONSULTING, INC., a
Minnesota corporation,

           Defendants.

No. CV 09-1185-MO

OPINION AND ORDER

**MOSMAN, J.,**

        Plaintiff Epiq Class Action and Claims Solutions, Inc. ("ECA") seeks to enjoin its former employee, defendant James Prutsman, from working for competitor-defendant Rust Consulting, Inc. ("Rust") in violation of Mr. Prutsman's noncompetition agreement. Plaintiff's Motion for Preliminary Injunction (#5) also seeks to enjoin Mr. Prutsman from misappropriating trade secrets and intentionally interfering with economic relations. For the reasons set forth below, I GRANT plaintiff's Motion for Preliminary Injunction (#5).

## BACKGROUND

        The parties presented and discussed the facts of this case at length during a two-day hearing. Following the hearing, I issued orders regarding several other matters in the case, advised the parties of my tentative views, and took the instant Motion for Preliminary Injunction (#5) under advisement. I also requested supplemental briefing on the breach of contract claim

PAGE 1 - OPINION AND ORDER

and the misappropriation claim, subsequently provided by ECA (#66) and Mr. Prutsman (#71). The following facts are pertinent to the final resolution of this motion.

Mr. Prutsman joined Poorman-Douglas Corporation in 1997 as a systems and programming manager. By 2003, he was serving as the Director of Information Technology Systems at Poorman-Douglas. On May 1, 2003, Mr. Prutsman moved from the IT team to the sales team. On the same day, he signed a noncompetition agreement ("the 2003 Agreement"), in which he agreed to refrain from performing "any work as a competitor or for a competitor of the Company or any assignee" for "two years following separation of employment." (Pl.'s Ex. 6.)

On January 30, 2004, Poorman-Douglas's parent or holding company merged with Epiq Systems, Inc., which also purchased all of the outstanding Poorman-Douglas stock.[1] While Mr. Prutsman, a shareholder, received a substantial payment as part of the transaction, his job duties did not change at the time of the acquisition. As part of the acquisition, all Poorman-Douglas employees were required to complete new employment applications, but none were actually terminated for any period of time as a result of the change in ownership. Also, at least some employees, including Mr. Prutsman, were asked to sign noncompetition agreements as part of their new employment contracts.

On January 31, 2004, following the acquisition, Mr. Prutsman signed a second noncompetition agreement ("the 2004 Agreement") with Epic Systems, Inc.-owned Poorman-

---

[1] The parties dispute whether the transaction between Epiq Systems, Inc. and Poorman-Douglas Corporation is more properly characterized as a merger or a stock acquisition. This distinction, and its implication, was not precisely defined by defendant at the hearing, and I suspect that additional facts might be necessary to make a finding about the proper characterization of the business transaction at issue. While the distinction is not critical to the foregoing policy analysis, it seems that Mr. Prutsman's characterization is more accurate, so for purposes of this motion I refer to the transaction as an acquisition of stock rather than a merger.

PAGE 2 - OPINION AND ORDER

Douglas. (Pl.'s Ex. 14.) Pursuant to the 2004 noncompetition clause, Mr. Prutsman agreed not to "compete with the Company or engage in employment . . . [with] any person, corporation, firm or other entity which [competes with] the Company" for twelve months. (*Id.*) The employment agreement signed by Mr. Prutsman also contained a merger clause, stating that the "Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us." (*Id.*) In 2007, Epiq Systems, Inc.-owned Poorman-Douglas changed its name to Epiq Class Action and Claims Solutions, Inc., the named plaintiff in this case.

Mr. Prutsman resigned from ECA on September 17, 2009 and filed suit in California the following day requesting a declaration that he was not subject to an enforceable noncompetition agreement. Rust joined the California action and is also a defendant in this case.

## DISCUSSION

To obtain a preliminary injunction, ECA must show: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Nelson v. Nat'l Aeronautics & Space Admin.*, 568 F.3d 1028, 1030 n.5 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008)).

At the hearing, I determined that the second, third, and fourth factors weighed in ECA's favor for the purposes of granting a preliminary injunction. ECA's likelihood of success on the merits, particularly regarding the validity of the 2004 Agreement, remained an open question on which the parties filed their supplemental briefing.

**I.      Likelihood of Success on the Breach of Contract Claim**

PAGE 3 - OPINION AND ORDER

Despite the general antipathy toward restraints on competition, Oregon law includes two narrow exceptions that allow employers and employees to enter into valid noncompetition agreements. At the time of both the 2003 and 2004 Agreements, Oregon law provided:

> (1) A noncompetition agreement entered into between an employer and employee is void and shall not be enforced by any court in this state unless the agreement is entered into upon the:
> (a) Initial employment of the employee with the employer;

or

> (b) Subsequent bona fide advancement of the employee with the employer.

ORS 653.295 (2004).

### A.     *The 2003 Agreement*

Initially, I find that the 2003 Agreement signed by Mr. Prutsman when he joined the sales team fits within the exception provided by ORS 653.295(1)(b) as interpreted by this court. *See First Allmerica Fin. Life Ins. Co. v. Sumner*, 212 F. Supp. 2d 1235, 1241 (D. Or. 2002) (holding that "bona fide advancement" means an actual change in the employee's job status or duties performed). The parties dispute whether the change in Mr. Prutsman's compensation structure, from basic salary to a commission-based compensation, actually increased his compensation. I find, however, that the significant change in job duties upon joining the sales team is sufficient to fairly place the 2003 Agreement within ORS 653.295(1)(b).

### B.     *The 2004 Agreement*

The primary question, then, is the effect of the 2004 Agreement. It is clear that Mr. Prutsman did not receive a bona fide advancement at the time he signed the 2004 Agreement. Plaintiff argues instead that the 2004 acquisition of Poorman-Douglas stock by Epiq Systems, Inc. created a new entity such that all employees began new employment relationships, allowing for the implementation of noncompetition agreements under ORS 653.295(1)(a). (Pl.'s Supp.

PAGE 4 - OPINION AND ORDER

Mem. (#66) 4-6.) Every Oregon case found by this court analyzed "initial employment" as a question of timing—for example, whether a six-day delay between an employee's start date and the date he or she signed a noncompetition agreement renders the agreement invalid. *See Perthou v. Stewart*, 243 F. Supp. 655, 659 (D. Or. 1965). No case specifically addresses plaintiff's argument here.

      Plaintiff alternatively argues that even if the stock acquisition did not constitute initial employment, the 2003 Agreement was a personal service contract between Mr. Prutsman and Poorman-Douglas. (Pl.'s Supp. Mem. (#66) 6-7 (citing *Ball v. Day*, 644 P.2d 649 (Or. App. 1982)).) As such, the contract would be unassignable, leaving the new owner, Epiq Systems, Inc., without any protection against competition by its employees, even those who were previously subject to valid agreements. (Pl.'s Supp. Mem. (#66) 6-7 (citing *Perthou*, 243 F. Supp. at 659).) *But see Mail-Well Envelope Co. v. Saley*, 497 P.2d 364, 367-68 (Or. 1972) (holding that noncompetition agreements are assignable if provided for in the agreement itself). Therefore, ECA argues, public policy supports treatment of the stock acquisition as commencement of new employment because the alternative analysis would prohibit the new owner from obtaining noncompetition agreements unless it terminated all the employees, promoted them, or substantially changed their duties. (*See* Pl.'s Supp. Mem. (#66) 9-10.)

      The specific facts of this case do not persuade me that ECA is likely to succeed in showing the 2004 stock acquisition formally created "initial employment" pursuant to the statute. Nor do I find that the 2003 Agreement was unassignable under Oregon law.[2] For separate

---

[2] When read together, *Perthou* and *Mail-Well* suggest that a personal service contract prohibiting competition against a specific employer is only assignable if the employee is on notice, at the time the employee signs the agreement, that he or she would also be prohibited

PAGE 5 - OPINION AND ORDER

reasons, however, I find that the unique facts of this case fit squarely within the policy behind the law, creating a likelihood that plaintiff can succeed on the merits of its breach of contract claim, warranting an injunction at this stage of the case.

### C. *Public Policy Behind ORS 653.295*

The public policy behind Oregon's exception to the general antipathy toward noncompetition agreements illuminates the issue at hand. House Bill 2615 (1977), the bill that led to ORS 653.295, initially prohibited all noncompetition agreements as against public policy. *McGee v. Coe Mfg. Co.*, 125 P.3d 26, 28 (Or. App. 2005). Members of the business community, however, described to the legislature that noncompetition agreements could be reasonable in some limited circumstances. *Id.* Based on the legislative history accompanying ORS 653.295, the Oregon Court of Appeals concluded that "the legislature intended to protect employees from surprise and oppressive tactics" by allowing noncompetition agreements only upon initial employment or a bona fide advancement. *Id.* at 28-29 (quoting *Pac. Veterinary Hosp. v. White*, 696 P.2d 570 (Or. App. 1985)).

The court of appeals recognized the legislature's view that noncompetition agreements are particularly harmful "where an employee can be so bound by an employer without any guarantees [or] any additional benefits." *McGee*, 125 P.3d at 28 (quotation and citation omitted). In such instances, the imposition of a noncompetition agreement places an additional burden on the employee without a corresponding benefit, potentially coercing the employee to agree to the employer's less favorable terms or risk losing his or her employment.

---

from competing with a subsequent assignee. Here, the 2003 Agreement's prohibition against competition with Poorman-Douglas "or any assignee" likely placed Mr. Prutsman on notice that his obligation would continue if Poorman-Douglas assigned the contract to a new owner.

PAGE 6 - OPINION AND ORDER

Immediately prior to Epiq Systems, Inc.'s acquisition of Poorman-Douglas, Mr. Prutsman was subject to a noncompetition agreement, validly entered into upon his transition to the sales team. Mr. Prutsman argues that the 2003 Agreement simply continued by virtue of the stock acquisition itself. (Defs.' Supp. Mem. (#71) 3 ("Epiq Systems' 2004 purchase of stock . . . had no effect on the 2003 Agreement.").) Even if the contract did not remain in effect, Mr. Prutsman argues, the 2003 Agreement was assignable. (*Id.* at 8-9.) Instead of pursuing one of these options, the new owner alternatively chose to create a new, *less onerous* noncompetition agreement between Epiq Systems, Inc.-owned Poorman-Douglas and Mr. Prutsman. This new agreement merged, and rendered invalid, the otherwise valid 2003 Agreement.

These entirety of these circumstances, specific to Mr. Prutsman,[3] create an inference that the 2004 Agreement was devoid of the coercion the Oregon legislature aimed to prevent, and did not "surprise" Mr. Prutsman by *increasing* the burdens on his employment "without any guarantees [or] any additional benefits." Rather, the new owner of Poorman-Douglas presented Mr. Prutsman with a more favorable agreement, reducing the period of noncompetition from two years down to one. *Cf. Pac. Veterinary Hosp.*, 696 P.2d at 573 (holding that the employer's imposition of "a more onerous noncompetition agreement than [the] one entered into on defendant's initial employment" rendered the subsequent agreement invalid). While the unique facts of this case do not fit cleanly into any existing analysis by Oregon courts, I believe they would agree in finding that the legislature's intent was met under these facts.

## II. Misappropriation of Trade Secrets

---

[3] This opinion makes no attempt to answer the related question of whether an identical agreement could be enforced against an employee who was not previously subject to a valid noncompetition agreement.

PAGE 7 - OPINION AND ORDER

I similarly find that ECA has a likelihood of success on its claim for misappropriation of trade secrets pursuant to the Oregon Uniform Trade Secrets Act, beginning at ORS section 646.461. While I do not agree that everything ECA holds out as a trade secret necessarily qualifies as such, at least some information seems to derive independent economic value from its confidentiality—for example, ECA's 2009 Commission Plan and inside knowledge of upcoming important events or milestones in certain class action cases. ECA's attempt to keep such information secret is demonstrated through its policy of requiring employees, particularly sales people, to sign noncompetetion agreements. Further, the evidence suggests that Mr. Prutsman may have misappropriated this confidential information by providing it to Rust. (*See* Pl.'s Ex. 20; Pl.'s Ex. 56.)

Without making specific findings as to the examples of alleged misappropriation presented by ECA, I also find that Mr. Prutsman likely misappropriated what Rust itself views as confidential. (*See* Pl.'s Ex. 28, Employment Agreement between Mr. Prutsman and Rust Consulting.) A jury is likely to find Rust's own definition of confidential information or trade secrets persuasive in the context of Mr. Prutsman's relationship with ECA. Therefore, I find that ECA presents a likelihood of success on this claim.

### III.    Intentional Interference with Economic Relations

To succeed in its final claim,[4] ECA must demonstrate (1) the existence of a professional or business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relationship; and (6) damages. *McGanty v.*

---

[4] ECA withdrew its unfair competition claim.

PAGE 8 - OPINION AND ORDER

*Staudenraus*, 901 P.2d 841, 844 (Or. 1995). As I described at the hearing, the only open question in this case centered on whether Mr. Prutsman's interference with the relationship between ECA and its customers occurred through improper means or for an improper purpose. While I find that Mr. Prutsman's purpose was merely to compete, he likely used improper means in interfering with ECA's client relationships—i.e., he likely misappropriated trade secrets and used confidential information to lure ECA's existing customers to his new employer, Rust.

## CONCLUSION

For the reasons given above, I GRANT plaintiff's Motion for Preliminary Injunction (#5). I enjoin Mr. Prutsman from: (1) competing with ECA in violation of his noncompetition agreement; (2) misappropriating ECA's trade secrets; and (3) intentionally interfering with the economic relations between ECA and its clients.

IT IS SO ORDERED.

DATED this  13th    day of  November        , 2009.

 /s/Michael W Mosman  
MICHAEL W. MOSMAN  
United States District Judge